Next matter is Regional Employers Assurance v. Public Trust. Mr. Kreisman. Good morning. May it please the Court, I've asked for five minutes of rebuttal. Fine. My name is Joel Kreisman, representing the appellants. The District Court issued summary judgment against the employees based on the alleged use of their money to purchase insurance policies or to continue paying the insurance policies for them. There is absolutely nothing in the record to that effect. The record, based on the administrative findings of the appellant, is that they used the money to pay their own legal fees. Although, we don't know. I couldn't figure out whether it was that or whether it went into a pooled asset. That statement about going to the pooled asset is in the brief. However, there's no cite to the record in the brief to that effect. That was one of the questions I asked Mr. Kreisman. Is there any money left? We don't know. We've never had an account. The most we've had, in 1998, we get a ledger sheet which says each of the employees are entitled to X dollars in their cash values. There's no statement as to how it was derived. Isn't that what we usually get from an insurance company? When you want to surrender a policy, you usually get a statement of this is how much it's worth. And that's what you get? We didn't get that. We've asked for that. How much are our legal fees? What did the spreadsheet that you got provide? It provided the names of the employees, how long they've been working there, how much they're entitled to in cash values. What more do you want than that? I want to see the underlying documents. I want to know how it was derived. We paid $283,000 to Penmont to purchase these insurance policies. We're told that it's $175,000 in September of 1998. But there's no statement as to what happened. Obviously, there are premiums to be paid. But there's also interest. We've never received any accounting as to what happened. Did you send interlocutories and request in discovery for documents that reveal where the money is, whether the policies are enforced, what the money was used for? The first time I heard that this was the claim was in the summary judgment briefing. What was the claim? That they used the money to pay for insurance policies. If you look at the administrative record, they say in 10 different spots, we used the money to... That's not my question. My question was, did you ask in discovery for documents or for specific sworn answers to the questions, where is the money, what was it used for? Give us all of the detail. I asked Mr. Carrasco at his deposition. And he asserted the attorney-client privilege. If there's anything of substance, he's asserted the attorney-client privilege. Was it the finding or conclusion of the district court that the money was used to continue the policies? He did say that. There's no question he says it, but I don't know where he got it. Well, actually, the district court criticized you for not meeting your burden to show whether the life insurance was continued or not. I understand that. And it seems to me, you know, if there's no record, if somebody says in a brief, I did X, and there's no record to support that, how can I possibly counter that? Especially when the record says otherwise. Did you have copies of the policies? No, we did not. Under Rule 56, their statements in the record that they used the money to pay their legal fees, in itself creates a material issue of fact. Their own documents, their own statements and submissions creates a material issue of fact. How am I going to counter a statement of thin air where there's no record whatsoever? Number two, they're a fiduciary. They have an obligation to account. The burden shouldn't be on the employees to find what they've done. They have an obligation to come out and say what they've done. Essentially, they terminated when your clients would not sign the releases. The releases to... Or to join the Real V.I.B.A. Correct. We did not join Real V.I.B.A. The requirement to join Real V.I.B.A. said that we were going to release any of their conduct. You were the only market that did not join Real V.I.B.A. That's what they say. I have no way of knowing that. I really don't think it matters. Well, it seems... The picture that's painted is that you didn't comply with a lot of things early on. Before Gene Weiss died, we already had a dispute with them. The dispute was that we had sent them money to buy insurance policies and they hadn't done it. If you look, there's a letter... Gene Weiss dies in January of 1998. There's a letter in December 1997 that we're already considering not joining or terminating. Because you haven't done what you promised to do. They claim that we didn't provide all the information they needed. We do know two things in terms of that. Number one, we know that there was at least cash values as a result of what we did of $175,000 as of September 1997. That would be the late V.I.B.A.? That would be late V.I.B.A. And number two, we know that the Gene Weiss insurance policy was in effect. We had paid enough money to keep that in effect. And they in fact collected $263,000 on that one. But we can never find out what happened to it. Well, I guess the issue there... If the Bam Boyd provision applies such that the money then gets forfeited... It seems strange. If someone has defrauded their employer, then that policy gets forfeited. But my question would be, forfeited to whom? To me, it should be forfeited to the employer, not put back into the multi-employer plan. Well, you know, I agree with that. And I also... We don't know what went back into the multi-employer plan. There is a statement in a brief saying that. But if you'll note, in that brief, in that statement, there is no cite to a record. That's why I asked Mr. Kresko, where did the money go? Wasn't that part of the agreement that you signed with the plan administrator? That if the Bad Boy provision applies, that the insurance proceeds would be forfeited to the plan? Whether that's a good thing or a bad thing? Isn't that what you agreed to? We did sign the agreement. Whatever it says, it says. Why doesn't that control? Because there's two reasons. Three reasons, I would say. Number one is that if it makes no sense under ERISA policy, then it should be declared an illegal clause. Number two, that even if the clause is viable, Jean Waite was already deceased by the time it was discovered that she had embezzled this money. So she was no longer a participant. So she doesn't fit within the terms. Number three is... I don't think that's your strongest argument. No, I don't think so either. Number three is Craig Waite is the one making the claim here. He's the beneficiary. He's not a participant. He didn't do anything wrong. Isn't it being made on your behalf? Aren't you the one who's making the claim? On behalf of Craig Waite. Isn't there a bad boy provision in the plan? There is. But this is after the fact. I mean, Craig Waite would get the money. Whatever he does with the money... Is he a party in this case? He would get the money. And whatever he does with the money... There are cases saying even when the anti-alienation provisions apply, they don't in welfare benefit plans. But going back to the plan, doesn't it say that the money goes back to the plan rather than to the beneficiary? If the bad boy provision applies? If there is a forfeiture prior to the death, yes. But just because it says that, there is no basis. We have nothing in the record to show if that really happened. And Mr. Koresko refused to answer that question. We've never had a sworn statement as to what happened to it or where it went. But does it matter if it happened? The point is that you're not entitled to it. Well, we're not entitled to it if in fact the bad boy clause is applicable and it is valid. I reviewed this case from early on as a summary judgment case. It seemed to me that there was an issue about the bad boy clause. There was an issue as to an accounting. There was an issue as to the employees' money. We didn't know when I first filed the suit. I filed the suit in New Jersey in May of 2000. It was partly because they demanded this release for the employees to get the money. We wanted accounting. It's their money. You're a fiduciary. Would you have a problem if it were determined that the monies with the plan that were supposed to be paid to the employees were actually used to continue the policies? I think if that happened, it probably would fit within 9.02 of the plan. If they could prove that they did that, it would fit within 9.02. What do you mean it would fit within 9.02? 9.02 is the termination provision. It says that if an employer is terminated, either voluntarily or involuntarily, it is impossible for the money to be used anywhere except for the benefit of the participants or their beneficiaries. If, in fact, it was used to pay to continue insurance policies, I guess I would have to say it was used for the benefit of the beneficiaries. But then wouldn't there be cash value? It depends. There was cash value at one point. If, in fact, the money was taken and used to pay for the insurance policies and there was nothing left as a result, that's one thing. But if it was used to pay fees because we had the audacity to challenge them, first of all, we don't even know what the fees were. They just said, we don't have to tell you. We're just taking your money to pay our fees. We don't have to tell you how much it is. Let's hear from Mr. Goldberger. We'll have you back on rebuttal. Thank you very much. Good morning. Good morning. Nice to be at this table. Don't get that too often. My name is Peter Goldberger, and I'm here on behalf of the amputees who were plaintiffs below. There's a lot of sound and fury going on in this case, especially in the briefs, not so much this morning, about facts. This is a declaratory judgment action decided on cross-versions for summary judgment. When you ask about the legal questions in the case, who is claiming what, especially on appeal, it's not a difficult case. Judge Sanchez correctly identified the issues. He applied the correct standard of review to uphold plan administrator decisions. That's the way ERISA works when it's challenged in court. How did Judge Sanchez boil this down to four questions when there are probably 15 different issues here? Including standard of judging what's going on here, the validity of the request for releases. There are a lot of issues here that just weren't touched on by the district court. Well, there really are only two issues on appeal. Maybe three if you count the standard review. Standard review on appeal is de novo, but the question is de novo on what? I understand what you're asking. I understand what you were saying of was there any deference due by the district court, which you would then apply de novo in the same way. I agree with that. Two out of standard of review issue. Are any of these appellants entitled to the death benefits from the insurance policy? Are any of these appellants entitled to cash out of the plan on account of the termination? There are no other issues. There were cross-motions for summary judgment in the district court. Mr. Christman's complaint now that we don't know this and we don't know that is completely answered by Your Honor's question, why didn't you oppose summary judgment and seek further discovery? Why are they not entitled to money under these policies now? Let's start with the life insurance policy. Actually, can I say one quick thing first, and then I'll break it down into the two pieces. First of all, the questions for the bench directed to my adversary have been, what do you claim? And the response is, we claim. But I'd like to articulate who is we here on the other side. Cindy Charles Markets Incorporated did not appeal. The principal entity that was litigating in the district court is not an appellant in this court. The we here on the other side consists of two groups of people, or one person and a group of people. Great Weight, the widower, and the employees. To the extent that the owners of Cindy Charles Markets, the Zimmermans, are involved, it's because they incorporated and they're employees of the family corporation. But they're here in their capacity as employees like any other employee. The market is not a party to this appeal. They're not named in the Notice of Appeal. The appellants do not challenge the termination of the league plan. They don't challenge the creation and replacement of it by the real plan. They don't challenge the termination of the Cindy Charles Markets from either the old or the new plan, because of its non-cooperation and refusal to accept conditions that the other members accepted. So, why are these appellants not entitled to an opening to district court? Now, on that foundation, who could conceivably be entitled to benefits from the life insurance policy? Common sense instinct tells you the widower, right? But there's a bad boy clause. And the bad boy clause says that when Gene Wade embezzled more than a million dollars over the period of many years, and my understanding is it's more than a million, it's something like a million and a half just in the last six years that they were able to audit, that she forfeited her and her family's right to life insurance. Who else suffers from a forfeiture of a life insurance policy than the beneficiary? He's not the innocent victim. That's baloney. Who got the money? As much money, if you divide one and a half million by six, that family got as much money every year for six years, and who knows how long before that. Who got the $280,000? Sorry? Who got the money to be paid under that life insurance policy? It's your life insurance company. Pardon me? Oh, I'm sorry, the benefits? Yeah. The trust, as pursuant to the plan. It says on the multi-employer trust that it was entitled to keep that? Yes, of course. The employer had paid good money for it? Yes. So you would say forfeiture? If they wanted to have some other plan or have some other bad life insurance, they could go buy their own life insurance policy. They bought the services of this entity through this group to buy life insurance for their employees, and it's good policy. It's good policy. Where does it say the forfeit means that the plan doesn't have to pay out the money? Well, if it's an ERISA plan... As compared to forfeit to the employer. If it's an ERISA plan, certainly it could never be the employer. That's the golden rule number one. The employer can't benefit from an ERISA plan, can't step into the shoes of a beneficiary or be a beneficiary or be the recipient. They agreed to a plan, and the forfeiture of the money to the plan works to the benefit of all beneficiaries and thus to the benefit of all employers. It gives them incentive to buy this plan for all these employers, for all their employees, and to keep their employees honest. Is that a factor that weighs in the premiums that are paid by the plan? I'm sure it does. The plan's got to support itself. Intuitively, it doesn't seem terribly equitable that you get the money versus, for example, the employer, which is the one that suffers the greatest loss from the employer. Again, here's the you question. Who's you? Who gets the money? The people who gets the money is a trust. All the beneficiaries of the plan ensure the plan has expenses. It has to be administered. It sometimes even has to hire and pay lawyers. It's going to pay that money out of the assets. How about the non-alienation provision? The money can't be used for that. Oh, it absolutely can. Section 10.10 of the LEAD plan is read in conjunction with all the other provisions and allows the assets contributed by an employer to be spent just the way we say they were spent. And if there's some question, let's talk about the record here. It's absolutely untrue that Judge Sanchez granted summary judgment without a basis in the record. The record, which now we filed approximately three times in various sloppy appendices, I'm afraid, is not three isolated statements in a summary of the hearing, which is what my friend on the other side cites, but is a stack of correspondence back and forth between the plan administrators and the market folks and their lawyers, both Mr. Zimmerman himself and their lawyers. It goes back and forth and back and forth. And the statements made by Judge Sanchez are thoroughly supported in dozens of letters, in correspondence found in over 100 pages of appendix. I realize this was a question I went looking for. I've only been in the case 10 days, but I've been looking because I realize this is a key question. Let me ask a question based upon the issues on appeal. The first point raised in the blue brief is that the district court erred by giving deference to the determinations of Penmont and Carresco. Yes. The district court deals with it in footnote 8, talking about the structure of the plans. It doesn't make any mention of the fact that the channel that was to hear and appeal here was made up predominantly of Carresco-affiliated personnel. Should not that add that there was plenty of money at stake here, which, as we have noted in our opinions, is something to be considered? Tell me why the district court's ruling looking only to the structure of the plan was not incorrect? ERISA authorizes all of these kinds of entities that Carresco-related people run for a living. This is what they do. They establish and run plans like this, right? And it authorizes these kinds of interconnected relationships which you could never have in certain other settings. But when it comes before a court, we are entitled to look differently at that type of situation than we would if there were totally arm's-length third parties where there was nothing to be gained, if you will, by the decision-makers. Here there is something clearly to be gained by the decision-makers. Only in their professional capacities for the work that they're doing. Money. It's called money. As a result of denying the claims, they would keep all of this money. No, they would not keep the money. None of them would get or keep any of the money. There would be money in the plan that would be allowed to be spent for plan expenses, administrative and legal. The plan has to be able to pay its administrative and legal expenses. And one of the ways that the plan is funded is from the occasional dishonest employee whose life insurance is forfeited, a sort of a fluke. I hope that doesn't happen very often. But what it does, it puts money into the plan that the plan can use to support its administration. How much money was kept by the plan here? $260,000, I guess. Well, that's from the life insurance. How about other money that was kept that was cash value of life insurance? Nothing was kept. Was there cash value of the life insurance? Do we know? I'm going to play by the summary judgment rules here. As best I can tell from this record, given that the other side, which now wants to dispute this exact fact, did not try to find out, didn't use the tools of discovery, they complain about an assertion of privilege, but they have no room to compel. They have no room to compel. The assertion of privilege, if your client's not willing to tell them what the money is, how should we put the burden on them to try to figure it out? They don't have to figure it out. They just have to walk down the hall to a judge and say, that's the silliest assertion of privilege I ever heard. Well, they're saying it before us. They have no room to compel. It's way too late. Could you explain, Mr. Goldberger, your conflicting positions with regard to the cash value of the insurance policies? That is, that you use it to pay legal fees, and then the judge is finding that it was used to pay the contingent policies. No, I think that's a misunderstanding. What I've said is that the totality of this multi-hundred, more than 100 pages of correspondence and the client conclusions show is that the money was used to continue the policies in force and pay premiums until it became absolutely clear that Sidney Charles Markets wasn't coming in or back into the plan. It was maintained so there wouldn't be a lapse. And then what? Because there was still correspondence going on. And then what was the money used for? And then when that couldn't be done anymore, whatever was left was reverted to the plan to be used for expenses, in this case, pursuant to 10.10, what my clients say is that pursuant to Section 10.10 of the lease plan, they used it to pay to identify their legal expenses of contesting this baseless challenge. Were this case to go back and were there to be discovery, the plaintiffs would learn that insurance policies were, in fact, continued by the amount of cash value? I can't tell you that from my personal knowledge. I can tell you that that's what I read and infer from the correspondence which is in the administrative record, which is what Judge Sanchez clearly based his conclusion on. And they're not entitled to go back for discovery. They forfeited that position by consenting to summary judgment and cross-voting for summary judgment and opposing summary judgment which is not under rule, what is it, 56C or whatever it says. That is an important position because it's a position that the plan is taking here. We use the cash value of the insurance policies to continue those policies. That's a good thing. Up to a certain date. Well, it depends how much money was available, $170,000, whatever it was. But my question was if this case were to go back the policies were in fact continued and their premiums were in fact paid up to $173,000. I know. That last part I didn't say that because it's not how I read the record. I read the record as saying that what their claim was that they continued the policies in force up to the time that the employer of these employees definitively and conclusively showed that they were not going to join. That's the reason. These releases were sent out and the invitation to join was sent at least four times in 1998 and 1999. Tell me what case says that a fiduciary can demand a release before complying with the surrender of cash value. Fiduciary, not employer. You've cited two cases that talk about employers who are not fiduciaries. Tell me what case supports the proposition that a fiduciary is paying over cash value that otherwise employees would be entitled to. I recognize the distinction that you're drawing, but it is the reasoning of Lockheed versus... I've read Lockheed. It talks about employers who are not fiduciaries. It talks about employers but not because they aren't fiduciaries. Tell me a case that says that notwithstanding 18 U.S.C. section 1110 it's hard to do under the plan that is surrender the cash values. I rely on the cases that were cited in the brief and if that is a factual distinction which does not, in my view, does not distinguish it on the principles of ERISA that the Supreme Court would decide in the Lockheed case based on. Are you saying 1110? How would you read 1110? I don't have the language in front of me and it's on my alarm bell that says don't talk about statutes you're not looking at. We'll give you a chance to look at it. Do you have it there? It's probably one of the reviews according to the judge's opinion versus what I have in front of me right now unless you want to direct me to some other place. I did bring a copy of the statute with me, but maybe you want to... I don't want to go off on a tangent. Well, to my mind, it's not a tangent. To my mind, had that failure, had that refusal not occurred, you wouldn't have had the issue of keeping policies in force while you demanded them to sign on to the next plan. But that's only one of the reasons that they're not entitled to prevail on the distribution question. That's the first and dispositive reason. Well, but from a timing standpoint, if they had refused at that point justifiably to sign the leases and said we're not going in, you know, we'll take the cash value and go, you wouldn't have had to keep the life insurance in force and then have the ability to pay fees, would you? I don't see where the... Or the fees wouldn't have accrued. I don't see the... I don't see the importance of talents preserving appeal, the position that they're entitled to prevail. They would have prevailed... They would prevail had they... If they were willing to join RealViva were it not for the release issue and that that's the era on which the case turns. Let me read 1110 to you. It says, Any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under those sections shall be void as against public policy. Well, we don't claim that the administrator was relieved of his fiduciary duty. We say he acted in accordance with the plan. Can you condition the right of the employees to get cash value on demanding a release which really is not valid under law? I haven't seen any law that says you can't. It's a reasonable... It's a reasonable provision of the plan for the reasons stated by the Supreme Court and it... The administrator adhered to it. When they were going back and forth as to whether or not SCM would join the RealViva, it's my understanding that at one point they sought to obtain payment of the cash. They sought to obtain the payment of cash values of its employees. An account... And a spreadsheet was sent to them. And they wanted something that was more complete. They wanted a form of an accounting. So the question is... And they refused to sign the releases. And then everything fell apart after that. So I guess the question is were they required to submit a full accounting at that particular point or was what plan sent sufficient to comply? Well, the plan was to your discretion to determine the form and extent of the accounting. There was... Following that accounting which occurred in 98, there was, again, a long sequence of subsequent correspondence and the Judge Sanchez's opinion, I believe, the text page 11 near footnote 12 relies not on that early accounting but on the accounting and all the subsequent correspondence as being sufficient to find that an adequate accounting was given  with the plan. And that's at page 333 of the appendix. Is that the accounting you're referring to? The spreadsheet? I wouldn't be surprised but I couldn't verify the number. I'll check right now. Which... the final supplemental appendix that was just submitted? Yes. No, no.  It's the... The original appendix? The original... I'll check that. The original supplemental appendix. But it's not just that document. It's that document and all the correspondence about it for the next year and a half. That's what Judge Sanchez relied on as satisfying him. Good. Any other questions? Mr. Bolger, thank you very much. Thank you, gentlemen. Mr. Kreisman. Number one, when we were asked if we wanted to join RealViva, there was no statement that if you don't join RealViva, there will be a forfeiture. RealViva was given as an option. As a matter of fact, if you look at even the brief submitted on behalf of Penmont, it says we ask them if they want to. They use that word. They don't say if you don't join RealViva, you're going to lose your cash values. You're going to lose anything. And we want to. We didn't trust them. We weren't going to join. So, it seems to me that especially with the fiduciary, if there's going to be a forfeiture, there has to be a warning. There was never a warning. Well, I thought you had a couple of chances to join. Oh, we had a lot of chances to join. But it was only threats. It was never another... It's not that they said we want you to join. But that doesn't mean that we... No one said that if you don't join, you're going to lose something. We were never told that. Number two, the letter in the... Now, I'm citing to the       It's DSA. The letter is dated March 4th, 1999 from Mr. Carresco. It's dated March 4th, 1999 from Mr. Carresco. Subjected to Section 533 Subjected to Section 533 which says all policies are to be liquidated. That's when he says, you know, we're going to get rid of you, you know, when you're termed, you're going to be terminated and all policies are to be liquidated. So what Mr. Goldberger is talking about all these letters going back and forth... you know, first of all, it's hard to respond to a letter that says all policies are to be liquidated. It doesn't indicate to me that the policies are going to be continued and the money's going to be paid out from the employee's cash value over time. So that's contrary and again, creates a material question of fact and nothing else. With regard to the bad boy clause, no question this is a welfare benefit plan, not a pension plan. Pension plans has been ruled in the statute saying that bad boy clauses are not valid in pension plans. However, one court and I cite in the brief, the Frary Court, it's in Northern District of the statute dealing with pension plans but says rather that it's contrary to the obligation of the fiduciary to administer  for the benefit of the participants and beneficiaries. It's contrary to that. And if you and that logic applies to both welfare and pension plans, it's contrary to the obligation of the fiduciary to administer for the benefit of the participants and beneficiaries. What was the figure that you were given that your the employees would have been entitled to for these benefits? It was $175,000 minus $4,000 for termination fee. Had you signed the release that you were asked to sign, you would have gotten a check for $175,000. But don't forget this was at a time not only didn't we have an accounting but we disputed their position on the correct way. We regarded that as extortion. Did you have a  of the $175,000 per employee? Yes. In the spreadsheet it does show what each employee is going to get. How big is the store? It's a one supermarket store. The non-union employees I think there was seven, eight, nine, that's all it was. Does the provision that talks about forfeiting, is that in the policy between the individual and the plan or is it in the agreement between the company and the plan? It's the plan. It's the plan itself. I don't remember if the employees had to sign that or not. The market had to sign two waivers or two different releases? We were asked to sign a release to get into the real VIVA. The real VIVA release was more to the forward in the future. Did you have to sign both releases in order to get the money? We certainly had to sign that. They just said to get the money you had to sign the VIVA release. I did move the magistrate had us have a deposition in his jury room. The first question I asked was who were the officers of Penmont. The magistrate in New Jersey first came out and first excoriated me. He said I'm just a volunteer here. You don't have jurisdiction over me. The judge turned to me and said serve him. I said fine. I tried for four months with a process server. I could never do that. He said you have to exhort       dismissing him. He said you have to exhort the magistrate to run because I'm dismissing him. I said you have to exhort  magistrate        said you have to exhort the magistrate to run because I'm dismissing him. He said you have to exhort the magistrate to run because I'm   I said you have to  the magistrate to run because I'm dismissing him. He said you have to exhort the magistrate to run  I'm        magistrate   because I'm dismissing him. He said you have to exhort the magistrate to run because I'm dismissing him. He    the        him. He  have to exhort the magistrate to run because I'm I'm dismissing him. He said you have to exhort the            magistrate to run because I'm dismissing him. He have to exhort the magistrate to run because I'm